UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

SPENCER MOORE,

    Plaintiff,

v.

FORD MOTOR COMPANY,

    Defendant.

Case No. 25-cv-

Hon.

_____/
ERIC STEMPIEN (P58703)
MALLORIE M. BLAYLOCK-DANNA (P84331)
STEMPIEN LAW, PLLC
Attorneys for Plaintiff
38701 Seven Mile Rd., Suite 445
Livonia, MI 48152
P/F: 734-744-7002
eric@stempien.com
mallorie@stempien.com
_____/

## COMPLAINT AND JURY DEMAND

Plaintiff, Spencer Moore, by and through his attorneys, Stempien Law, PLLC,

hereby complains against Defendant, Ford Motor Company, and in support thereof

states:

1.    Plaintiff Spencer Moore ("Moore" or "Plaintiff") is a resident of the City of

Southfield, County of Oakland, State of Michigan.

2.    Defendant Ford Motor Company ("Ford" or "Defendant") is a foreign for-

profit corporation which conducts systematic and continuous business in the

1

City of Sterling Heights, County of Macomb, State of Michigan; its resident agent for service of process being: The Corporation Company, 40600 Ann Arbor Road E., Suite 201, Plymouth, Michigan 48170.

3.  Jurisdiction is vested with this Court pursuant to 28 USC §1331, 42 USC §2000e, et. seq., and 28 USC §1367.

4.  The events giving rise to this action occurred within the Eastern District of Michigan.

5.  Moore filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

6.  On or about August 26, 2025, the EEOC issued a Dismissal and Notice of Rights letter to Moore for his Charge of Discrimination.

## GENERAL ALLEGATIONS

7.  Moore began his employment with Ford as a contract worker in 2016, became a full-time employee of Ford in Dept. #58 at the Ford Sterling Axle Plant in Sterling Heights, Michigan in 2017, and continued to hold his position in Dept. #58 until his employment was terminated on April 28, 2025.

8.  During his tenure as an employee of Ford, Moore was subjected to retaliation for reporting and opposing sexual harassment.

9.  In or about May 2023, Tawanna Rankin ("Rankin") became employed by Ford as a Process Coach and was Moore's immediate supervisor.

2

10. From May 2023 through at least May 2024, Rankin and Cecelia Berry ("Berry"), the Team Leader in Dept. #58, developed a close friendship which exceeded the scope of their work and, while at work, they would discuss their outside activities they indulged in together.

11. Upon Rankin's hiring in or about May 2023, Berry's performance significantly declined; Berry showed blatant disregard toward her Team Leader position, her lack of mutual respect negatively impacted Moore and his coworkers, and her poor leadership caused confusion, arguments and low work morale.

12. Since the onset of Rankin's employment with Ford, Rankin acted unprofessionally,  had little to no training as a process coach, lacked necessary knowledge of Ford's operational policies and procedures, would become easily rattled with minor decision-making tasks, would swear and use derogatory language, and appeared extremely overwhelmed.

13. On March 7, 2024 at approximately 7:20 p.m., while Moore was operating machinery in Dept. #58, he noticed Rankin about 45 feet away, waiving her arms above her head to get Moore's attention. Moore drove the machinery over to Rankin who then said, 'I have a question for you, but I don't want you to write me up or report me.' Moore asked Rankin what her question was and

Rankin replied, 'do you have a woman, or a girlfriend? I'm not asking for me, I'm asking for someone else.'

14.    Moore was startled, but he answered his direct supervisor's question and stated that he did not have a specific woman in his life.

15.    Rankin then asked Moore, 'What type of women do you like?' Moore, feeling further uneasy, answered, 'I like women who treat me nice.'

16.    Rankin then asked Moore, 'so, do you like tall women, short women, black women, white women?' as his coworker, Dontez Ramsey ("Ramsey") approached. Moore began feeling a tremendous sense of anxiety, replied, "I'm uncomfortable," and drove the machinery away.

17.    Moore did not solicit or entice the sexual conduct or communication.

18.    Rankin's conduct created a hostile work environment.

19.    On or about April 10, 2024 at approximately 4:40 p.m., Moore presented to work and, at or about 5:07 p.m., was instructed by Berry to run three lines with himself as the sole driver, as the other scheduled driver had previously taken that day off work.

20.    Moore told Berry that he could not physically perform that much work by himself, and Berry told Moore, 'if you have a problem working three lines by himself, don't talk to me, go tell Tawanna' Rankin.

4

21.   Moore walked over to speak to Rankin, who was sitting on top of a desk, and told her that: he was the only driver for three lines; he cannot do all that work by himself; and Process Coach Jerel ("Jerel") already confirmed that Dept. #58 requires two drivers at all times, which is how Dept. #58 had been operating for the past five months, regardless of the situation.

22.   Rankin stated there was a policy which would allow this course of action and claimed that Jerel did not know what he was doing.

23.   Moore again told Rankin that he cannot physically perform that volume of work by himself and requested to run only 2 lines. Rankin then told Moore, 'I'm not cutting a line. So, are you going to work or are you refusing to do your job?' Moore replied that he was not refusing to do his job, he was just asking if Rankin could get him some help. Rankin then stated, 'Are you refusing to do your job? Are you refusing to do your job? Are you refusing to do your job?' Moore again told Rankin that he cannot physically perform that much work by himself and that he needs some help. Rankin then told Moore that she was stopping his time because he was refusing to do his job.

24.   Moore reported this incident to Committee Person Luigi ("Luigi"), who told Moore that he was not getting paid if Rankin stopped his time, he might as well leave, and they would deal with this later.

25.   Moore exited the Plant and went home for the day, unpaid.

26.     Moore later learned that the drivers on another shift *only* operates when two drivers are present.

27.     As a direct consequence of Rankin's retaliatory mindset, Moore was forced to leave work and suffered lost wages, when Rankin could have, and should have, simply called in an overtime driver to work with Moore as a second driver.

28.     On or about April 15, 2024, Moore filed a grievance with his Union, in which he alleged that: Rankin's April 10, 2024 actions constituted an improper layoff; Moore and the Union were protesting Ford management sending Moore home without holding a hearing with his Union Representative; Rankin's action were in direct violation of Moore's Weingarten rights to have Union representation present when management is stopping his time and sending him home; Rankin should have notified the Union before proceeding with her disciplinary actions; and demanded 11.5 hours of straight time plus shift factors to be made whole.

29.     On or about April 15, 2024, Rankin prepared a false written "Threatening Behavior" statement alleging that Moore threatened her.

30.     As a direct result of Rankin's false allegations of threats, Moore was disciplined and suspended for three days.

31.    On or about April 19, 2024 near 4:00 p.m., Moore returned to work following his 3-day suspension. At approximately 5:20 p.m., Moore was approached by Rankin while Moore was standing at a desk with his coworker, Jaylen Thompson ("Thompson").

32.    Rankin instructed Moore and Thompson to 'sit at this desk all day, for now on. No more of that taking long breaks stuff.' Thompson asked why and Rankin responded to Moore and Thompson, 'You heard what I said. You gotta sit at this desk all day.' Rankin then walked away.

33.    In Moore's almost decade-long employment with Ford, under multiple process coaches, he had neither encountered any other drivers being subjected to a seating arrangement, nor is he aware of any other drivers being instructed – by Rankin or otherwise – to sit at a desk, all day, on any occasion.

34.    The Job Safety Analysis ("JSA") for Ramon drivers and material handlers does not call for seating arrangements for any drivers.

35.    On or about April 19, 2024, Moore filed a grievance with his Union in which he alleged that: Rankin was retaliating against, and intimidating Moore; Rankin's April 19, 2024 antics were intended to aggravate Moore to get him to say or do something inappropriate; Moore has been in Dept. #58 for eight years and never had any issues with any other Process Coach; and Moore had only been back at work for around an hour following a 3-day discipline for

allegedly disrespecting Rankin when Rankin resumed harassing and retaliating against Moore.

36. Rankin's "Threatening Behavior" statement concerning Moore was later reduced to a "Disrespect," which further infuriated Rankins.

37. On or about April 27, 2024, Rankin issued a Short Work Week ("SWW") to approximately six of Moore's lower-seniority coworkers.

38. SWW is strictly enforced on a seniority basis, but Rankins deliberately failed to issue a SWW to Moore with knowledge that Moore was second highest in seniority in Dept. #58 and should have been offered SWW prior to any lower-seniority employees.

39. On or about April 27, 2024, Moore filed a grievance with his Union in which he alleged that: Moore and the Union protest Rankin's treatment of Moore; Rankin is going out of her way to try to force Moore to get mad so he acts out; Rankins bypassed Moore's seniority to go home on SWW and sent lower seniority employees home on SWW instead; the retaliation and intimidation needs to stop; and requested that Rankin be removed from the area "ASAP."

40. On or about May 19, 2024, Moore reported to Ford that Rankin's actions were retaliatory because he rejected her March 7, 2024 sexual advances.

41. An agency, in collaboration with Ford, investigated Moore's sexual harassment claim against Rankin and, as of August 2024, substantiated

Moore' sexual harassment claims, Rankin was found to have violated Ford's sexual harassment policies, Rankin was removed for Dept. #58, Rankin was placed on a different shift than Moore, and Rankin was instructed to not have any further contact with Moore.

42.   Thereafter, Rankin would still visit the "3H" crew that she was removed from in Dept. #58.

43.   Rankin would still work overtime on the 3H crew she was removed from.

44.   Moore would never know when Rankin was going to visit his work area or work overtime in his work area.

45.   By allowing Rankin to continue having contact with Moore, Ford permitted the hostile work environment to continue.

46.   Upon Rankin's removal from Dept. #58, Berry retaliated against Moore for reporting Rankin's sexual harassment of Moore.

47.   Berry launched persistent, consistent, relentless, retaliatory, and personal attacks on Moore, his performance, and his career with Ford.

48.   In August 2024, Berry baselessly denied Moore's request for a SWW, despite Moore being second highest in seniority in Dept. #58.

49.   As part of Berry's basic job functions, she would receive correspondence from Ford's management on affairs pertinent to Ford's employees and was

expected to share, deliver, and/or announce all necessary information to Ford's employees she supervised, including Moore.

50. Berry would intentionally not relay important job information to Moore, but would directly share the information with all other Dept. #58 workers.

51. Berry would intentionally skip Moore so that he could not initial the H321 clipboard.

52. Berry would intentionally not inform Moore of any change overs in the department, safety concerns throughout the Plant, or future Ford plans relayed from upper management.

53. Berry would instruct Moore's Dept. #58 coworkers to relay information she shared with them to Moore, so as to avoid relaying any information to Moore directly.

54. As of December 2024, around 98% of the information Moore was receiving from upper management was relayed to him by his coworkers, not Berry.

55. For example, on or about December 17, 2024, Berry entered Moore's work area and engaged in a short conversation with a job setter, Vilson Camaj ("Camaj") about ten feet from Moore. Camaj then approached Moore and said that Berry told him to tell Moore that 'we're taking an extended 15-minute break for lunch,' as Berry was leaving the area.

56.   Berry engaged in retaliatory tactics, such as refusing to tell Moore herself about basic break information, on a normal basis.

57.   On or about December 18, 2024 around 6:20 p.m., Moore filled out a vacation slip and gave the slip to Process Coach Doug Dendoven ("Dendoven") who assured Moore that he would return the slip once it was verified.

58.   Around 7:34 p.m., Moore was approached by his coworker, Jalana Knight ("Knight") who handed Moore a yellow slip of paper and told Moore, 'this is your vacation slip, CC [Berry] told me to give it to you.'

59.   Accordingly, Berry did not follow proper protocol as a Team Leader, mishandled Moore's vacation request and slip by revealing the same to Knight, and intentionally compromised Moore's personal information.

60.   Moore immediately reported to UAW Committee Representative, Mike McConnell, ("McConnell") how Berry intentionally delivered Moore's personal information to a coworker.

61.   McConnell asked Dendoven how Moore's vacation slip ended up in the hands of his coworker and Dendoven said he was not sure because he gave Berry specific instructions to return the vacation slip back to Moore.

62.   Thereafter, and prior to the Christmas 2024 break, there was chatter in Dept. #58 that every worker would be rotated to a different line, but workers would

remain with their same/current group on the new line. Of course, Berry never reported any such thing to Moore and Moore figured it was just chatter.

63.  On January 5, 2025, upon Moore's return to work following Christmas break, Moore noticed that Berry had delegated different line assignments to every Dept. #58 worker, besides Moore.

64.  Moore then approached Berry to receive his new assignment but, without making any eye contact, Berry pointed in the direction on Line 1 and told Moore that he would remain on Line 1 until April 2025. Accordingly, Berry rotated every Dept. #58 worker besides Moore, as Moore had already been on Line 1 for the past three months.

65.  Moore, being second highest in seniority, should have been rotated with his lower seniority coworkers and should have been given a permanent assignment by Berry.

66.  Berry's singling out of Moore was retaliatory and she had no rational basis to do so.

67.  Moore then inquired about why he was not rotated with everyone else in Dept. #58 and Dendoven advised Moore that Berry was solely responsible for delegating any and all rotations in Dept. #58.

68.   On January 5, 2025, Moore reported Berry's failure to rotate Moore to both Luigi and McConnell, whom advised Moore that Berry had violated Moore's UAW rights and confirmed that Berry was singling Moore out, harassing him.

69.   On January 6, 2025, McConnell informed Dendoven that Berry had violated Moore's UAW rights by singling out Moore and refusing to rotate him.

70.   On January 14, 2025 around 5:22 p.m., Moore was approached by his coworker, Porshe Brown ("Brown"), who stated, 'CC [Berry] told me to tell you that you can go home on a SWW, but you must wait until Jerimiah comes back from medical. So I guess you must continue to work Line 1. I'm not sure what she wants you to do. You need to ask her.'

71.   This reveals Berry's continued unwillingness to communicate critical information to Moore, despite one of Berry's core job functions as a Team Leader being disseminating information when necessary, her retaliatory efforts reveal that she had become unfit to perform her role.

72.   On or about January 23, 2025 at approximately 6:40 p.m., when Moore was assigned to Line 3, Berry walked up to the Line and began talking to Troy Morgan ("Morgan"), who was about eight feet from Moore. A few seconds later, Moore heard Morgan state, 'I'm not telling Spencer [Moore] nothing, that's not my job. That's your damn job. If you want him to know something, you tell him. Hell, the man is standing right there!' As such, Berry, once again,

tried to have an hourly employee relay necessary information to Moore so that

she could continue retaliating against Moore.

73.     On or about March 15, 2025, Moore reported to work as scheduled and

quickly noticed that there was not any dunnage on the floor.

74.     Typically, when there is no dunnage available:

    a.     the Process Coach gives clearance to the Team Leader to offer a SWW;

    b.     the Team Leader informs the highest-seniority workers that a SWW is

        being offered;

    c.     the highest-seniority workers are offered a SWW and given the option

        to go home with pay.

75.     Moore, having the second highest seniority, knew of the high probability that

he would be offered a SWW that day.

76.     At approximately 5:50 p.m., while Moore was sitting at a table with his

Ramsey, Berry approached and asked Moore if he wanted to work that day.

Moore responded, 'what do you mean 'work today'? I'm already scheduled

to work today.' Berry replied, 'you can work if you want to.' Moore responded

by asking what his other options were if he did not work and Berry replied,

'well, you can have a SWW if you want.' Moore then told Berry that, 'PC

Ryan Rice already instructed you to offer me a SWW anyway, so why are you

offering me something different than what was told to you initially by your

14

boss?' Berry then said, 'are you leaving or not?' Moore then accepted the
SWW after having to pull the SWW offer out of Berry.

77. As such, this is another instance in which Berry omitted valuable information
from Moore and, had Moore not known the proper SWW protocol, Berry
would have bypassed him and offered the SWW to someone with lower
seniority than Moore.

78. On or about March 30, 2025 at approximately 6:05 p.m., Process Coach, Ryan
Rice ("Rice") approached Moore and asked him to initial a H321 Sheet, a/k/a
Safety Standard Sheet, which was on Heat Related Awareness and was of the
utmost importance to Ford employees' health and safety.

79. Upon review of the Sheet, Moore noticed that every other worker in Dept. #58
had already initialed the Sheet approximately one month prior and that the
Sheet had been in circulation for initials since February 2025.

80. Moore did not miss a prior chance to initial the Sheet, as he did not take any
sick, personal, or vacation days off work in February or March 2025. Instead,
Berry – who had total control of the H321 Sheet and was the sole person
responsible for circulating the Sheet among Dept. #58 as part of her daily
Team Leader routine – intentionally withheld the Sheet from Moore, in further
retaliation against Moore for reporting and opposing the sexual harassment of
Rankin.

81.   Moore asked Rice why he was the only worker who had not initialed the Sheet and Rice responded, 'I'm not sure, because CC [Berry] should have brought this Sheet to you a month ago.'

82.   Moore then reported to Rice that: Berry has been unprofessional and unethical toward Moore for the past year or longer; Moore wanted the mistreatment to stop; and Moore was stressed out and did not know what else to do.

83.   Rice responded, confirmed he was somewhat aware of what was "going on" with Berry, stated that he would talk with Berry, and told Moore to file a grievance against Berry because 'that's the only way this matter will get looked at and resolved.'

84.   On April 4, 2025, Moore arrived at work at about 4:40 p.m. and, by 5:09 p.m., Berry had begun delegating work assignments to Dept. #58 workers. Berry was walking parallel to Moore, made eye contact with Moore from about nine feet away, held up three fingers at him and pointed to Line 3.

85.   Moore assumed that Berry's eye contact, three fingers, and pointing to Line 3 meant that Moore was working on Line 3 that day, however, when Moore went to Line 3, all assignments were filled with lower-level employees.

86.   Moore then went to Line 4 where Berry was and told Berry that she assigned him a Line where all positions were filled. Berry responded antagonistically stating, 'nah, there must be something wrong with your eyes. I held up *four*

fingers.' Moore responded, 'You verbally tell everyone else what their assignment is and you need to do the same for me. I shouldn't have to rely on sign language.' Berry replied, 'Whatever. I wanted to hold up *this many* fingers,' and proceeded to hold up her middle finger about 2 feet from Moore's face so as to say "f**k you" in sign language, then walked away.

87. Berry's April 4, 2025 antics were witnessed by Thompson, which caused Moore further embarrassment and humiliation.

88. This ongoing, non-stop retaliation from Berry for Moore reporting and opposing the sexual harassment of Rankin had, by this time, caused Moore to dread going to work; negatively impacted his focus, performance, and production; and caused trouble sleeping and digestive issues.

89. On April 9, 2025 at approximately 5:26 p.m., Berry instructed Moore to go work on Line 1. Moore asked why he was being loaned out to Line 1 when lower seniority employees were available to be loaned out and protocol provided that the lower seniority employees were to be loaned out first. Berry responded, 'You're being assigned to Line 1."

90. Moore promptly reported this breach of seniority protocol to Rice, who responded by telling Moore that he does not have time for this, he does not want to hear it, and Moore should go talk to his Union representative. Rice then walked away.

91.   On April 9, 2025 at approximately 11:30 p.m., Moore observed Berry briefly speak to Ramsey, then Berry walked right past Moore. Berry was so close in proximity to Moore that Moore folded his legs sideways to give Berry additional room to walk passed him. Berry then walked up and gave brief instructions to Morgan before leaving the area.

92.   Once Berry was out of sight, Ramsey approached Moore and said, 'CC [Berry] just told me to tell you we're switching over, to work on Line 1' and 'I'm just telling you what she told me to tell you;" then Ramsey walked away.

93.   On April 9, 2025, Moore filed a grievance with David Wagner ("Wagner"), Employee Relations Coach, concerning Berry retaliating against him for him reporting and opposing the sexual harassment of Rankin. Moore's written grievance was extremely specific, thorough, and contained sufficient details to enable Ford to investigate his complaint.

94.   On April 13, 2025 at approximately 2:58 a.m., Moore observed Berry walk up to Alex ("Alex"), exchange a few brief words with Alex, walk away from Alex and up to Knight, exchange a few brief words with Knight, walk away from Knight and up to Ramsey, exchange a few brief words with Ramsey, and walk away.

95.   Moore then observed Alex, Knight, and Ramsey put on their coats and collect their personal belongings.

96.   Moore approached Alex and Knight and asked why they were collecting their things. Alex advised Moore that 'CC [Berry] just told me to stop working because they're cutting the shift short so we can go home early.' Knight stated, 'CC [Berry] said we're about to leave, so I'm getting my stuff now.'

97.   Accordingly, Berry refused to inform Moore that he too was allowed to leave work early, in further retaliation for Moore reporting and opposing the sexual harassment of Rankin.

98.   On Monday, April 14, 2025 at approximately 4:30 p.m., Moore arrived early for his shift and, at that time, only he and Berry were in Dept. #58, they were about twenty feet from each other, and they made eye contact as Moore walked passed Berry to his assigned line, Line 2.

99.   About five minutes later, a day-shift employee, Rodney, walked up to Moore and asked, 'why aren't you in your guys' meeting?' Moore was confused, as he just saw Berry and he had no knowledge of any meeting, and asked Rodney, 'what meeting are you referring to?' Rodney replied, 'CC [Berry] called a meeting in the Satellite Room and all your coworkers are already there.'

100.   Moore immediately went to the Satellite Room, discovered Berry and five of Moore's coworkers there and, as Moore entered, Berry said, 'Okay, that's all I have to tell you all today, so everybody can go back to their work area now.'

19

101.   Moore then stated to Berry, 'Wait, you never told me you were having a meeting, so what information did you tell everyone?' Berry replied, 'Do you want some overtime?' Moore responded, 'I am not interested in overtime I asked you, what information did you just tell my coworkers?' Berry replied again, "Do you want some overtime?" Moore responded, 'I just told you, I am not interest in overtime. I asked you what did you share with the group that you have not shared with me?' Berry replied again, "Do you want some overtime?'

102.   Moore then faced his coworkers, including Knight, Alex, Hakeem a/k/a "H", Brown, and Moesha, and said, 'I want everyone in this room to take note of the fact that Team Leader Cecilia Berry never informed me she was holding a meeting for the Dept. #58 workers, and she is unwilling to share with me what she shared in this meeting.' Moore then exited the Satellite Room.

103.   In refusing to inform Moore about a meeting, abruptly shutting down a meeting, and concealing information from Moore, Berry further retaliated against Moore for reporting and opposing the sexual harassment of Rankin.

104.   Berry never revealed to Moore what the April 14, 2025 meeting in the Satellite Room was about.

105.   Moore asked Knight what the meeting was about and Knight advised that: Berry told the Dept. #58 workers about the importance of eye protection while

working on the machines; they must wear earbuds for ear protection; and Berry told them to meet in the Satellite Room at the end of their shift that day to check out.

106. Accordingly, Berry failed to relay information to Moore which was critical, necessary information for every Ford Axle Plant employee.

107. Had Moore not learned this information from Knight, he could have faced injury and/or disciplinary action for not complying with the instructions Berry refused to give him.

108. By Berry making the malicious decision to not reveal this information to Moore, Berry intentionally compromised Moore's health, safety, time, and attendance.

109. On April 14, 2025 at approximately 9:30 p.m., Rice approached Moore while he was working on the line and asked him what happened in the Satellite Room.

110. Moore reported to Rice that: Berry called a meeting without telling Moore; when Moore learned about the meeting, he immediately went to the Satellite Room; Berry abruptly ended the meeting once Moore entered; the verbal exchange with Berry fully-elaborated herein above; and Berry had created a hostile work environment for Moore and he was very stressed out and frustrated. Rice responded stating, 'I understand,' then walked away.

111.  Approximately one hour later, Rice called Moore and told him to report to the front desk immediately.

112.  Moore promptly presented to the front desk where Rice, Area Manager Dion ("Dion"), and a member of Ford's security team were waiting for Moore, and Rice told Moore that Berry had given a statement to HR stating that Moore threatened Berry and, as a result, Moore was being escorted off the property.

113.  Moore asked what Rice was talking about and denied ever threatening Berry. Rice replied, 'I don't know what happened. All I know is CC [Berry] filed a complaint against you saying you threatened her, so anything further has to be addressed through HR but, right now, you have to go with security.' Moore complied and left the premises with security.

114.  On April 15, 2025 at approximately 11:25 a.m., Moore received a call from Maxine Richardson, Human Resources Security ("Richardson").

115.  Richardson is friends with Rankin and Berry.

116.  Richardson advised Moore that he was suspended without pay until further notice.

117.  Moore asked Richardson why he was suspended and Richardson stated, 'I can't tell you that because you're under investigation.'

118.  For the next nine days, Moore was suspended and was not provided with any details concerning Berry's false allegations.

119.  On April 23, 2025, a meeting was held between Moore, Richarsdon, and Union Representative Rod Burton ("Burton"), for the purpose of Moore providing a statement concerning the April 14, 2025 incident.

120.  Richardson first asked Moore, 'Did you threaten Team Leader Cecilia Berry?' Moore answered, 'absolutely not.'

121.  Richardson then asked Moore, 'Did you show Ryan Rice a text message that you sent to your girlfriend, threatening Cecilia Berry?' Moore answered, 'No, I did not show Ryan Rice any text messages.'

122.  Richardson then stated that she would make a determination regarding the findings of the investigation, told Moore that he would hear from her in a few days, and ended the meeting.

123.  On April 28, 2025 at approximately 3:15 p.m., Moore received a call from Richardson wherein Moore was advised that his employment with Ford was terminated, effective immediately, and her decision to terminate Moore was based *solely* on what Rice told her.

124.  Moore asked Richardson if she was aware of his April 9, 2025 retaliation grievance. Richardson stated that she was not aware of any additional information involving the incident and was only concerned about what happened on April 14, 2025.

125. On or about April 29, 2025, Moore filed a grievance with his Union in which he alleged that he was subject to an "unjust penalty of termination."

126. Ford retaliated against Moore for reporting that Rankin had sexually harassed him.

127. Ford retaliated against Moore for reporting that he was being retaliated against for reporting that Rankin had sexually harassed him.

128. The employment disciplinary actions taken against Moore prior to his discharge were all because he reported and opposed sexual harassment.

129. Ford's discharge of Moore for allegedly showing Rice a threatening text message was pretext for discharging Moore from his employment because he reported and opposed violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101 et seq.

## COUNT I –VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT (RETALIATION FOR REPORTING AND OPPOSING SEXUAL HARASSMENT)

130. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

131. At all material times, Plaintiff was an employee and Defendant was his employer, covered by and within the meaning of 42 U.S.C. § 2000e et. seq.

24

132. Plaintiff complained about sexual harassment and the events described above to Defendant.

133. Plaintiff engaged in protected activity when he complained to Defendant about the sexual harassment, as fully described above.

134. Plaintiff's protected activity was known to Defendant.

135. Plaintiff suffered adverse employment actions, including but not limited to reprimand and discharge.

136. There is a causal connection between the protected activity and the adverse employment actions taken against Plaintiff.

137. As a result of the foregoing, Plaintiff has suffered damages, including but not limited to: lost past and future wages, lost past and future employment benefits, loss of earning capacity, severe emotional distress, costs and attorneys fees.

## COUNT II – VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT (RETALIATION FOR REPORTING AND OPPOSING SEXUAL HARASSMENT)

138. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

139. Plaintiff engaged in protected activity when he complained to Defendant about the sexual harassment by Defendant's employee, as fully described above.

140.   Plaintiff's protected activity was known to Defendant.

141.   Defendant failed and refused to take any action regarding the harassment of Plaintiff.

142.   Plaintiff suffered adverse employment actions, including but not limited to reprimand and discharge.

143.   There is a causal connection between the protected activity and the adverse employment actions taken against Plaintiff.

144.   As a result of the foregoing, Plaintiff has suffered damages, including but not limited to lost past and future wages, lost past and future employment benefits, loss of earning capacity, severe emotional distress, costs and attorneys fees.

WHEREFORE, Plaintiff Spencer Moore prays that this Honorable Court enter judgment in his favor against Defendant, Ford Motor Company, in an amount that this Court deems fair and just, plus costs, interest and attorney fees.

## **JURY DEMAND**

Plaintiff, Spencer Moore, hereby demands a trial by jury of the within cause.

Respectfully submitted,

STEMPIEN LAW, PLLC

*/s/ Mallorie M. Blaylock-Danna*
Mallorie M. Blaylock-Danna (P84331)
Attorney for Plaintiff
38701 Seven Mile Rd., Suite 445
Livonia, MI 48152
P/F: 734-744-7002
mallorie@stempien.com

Dated: November 17, 2025